**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) ONEOK, INC.,<br>an Oklahoma corporation,<br><br>Plaintiff,<br><br>v.<br><br>(1) UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,<br>a labor organization, and<br><br>(2) USW LOCAL UNION NO. 348,<br>a labor organization,<br><br>Defendants. | ) | Case No. 4:26-cv-00700-JFJ |

**COMPLAINT AND APPLICATION TO VACATE ARBITRATION AWARD**

(29 U.S.C. § 185; 9 U.S.C. §§ 10–12; 28 U.S.C. §§ 2201–2202)

Plaintiff ONEOK, Inc. for its *Complaint and Application to Vacate Arbitration Award* against Defendants United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "International") and USW Local Union No. 348 ("Local 348") (together, the "Union"), alleges and states as follows:

**NATURE OF THE ACTION**

1. This action seeks to vacate a labor arbitration award issued by Arbitrator J.E. (Jim) Nash in FMCS No. 26-1121-01314 (the "Award"), which the Arbitrator emailed to the parties on October 9, 2026. The Award and the Arbitrator's email are attached as Exhibit 1.

2. The Award arises from the Union's grievance challenging ONEOK's discharge of Matthew Wooley, the sole operator at ONEOK's Capehart, Nebraska jet-fuel terminal. ONEOK

discharged Mr. Wooley after a pre-audit[1] and thorough investigation established that he violated numerous critical safety policies because safety records that he was responsible for completing and maintaining were missing, incomplete, or inaccurate, and that physical evidence contradicted his claims to have performed safety-critical pig runs and thermal-relief tests.

3. The Union's position at every stage of the contractual grievance and arbitration process was directed solely at one and only one issue, the final just-cause factor: the proper penalty. Specifically, the Union asserted that Mr. Wooley should have received some degree of discipline short of discharge, contending that he had no prior discipline and that his violations were merely "poor Workmanship" and not immediately terminable. The parties then submitted one question to the Arbitrator, which both sides stated in materially identical terms: whether ONEOK had just cause to discharge Mr. Wooley and, if not, what the remedy should be. The Arbitrator did not answer that question. He rewrote the issue to ask his own question, declared a "reliable merits determination impossible," and sustained the grievance on a ground no party had raised: that ONEOK violated a mandatory "Progressive Discipline Policy"—which does not exist—by not affording Mr. Wooley a pre-discharge, trial-type hearing, with advance notice of "[t]he time, place, and nature of the hearing," confrontation of "accusers," and cross-examination.

4. The parties' collective bargaining agreement ("CBA") requires none of those procedures, and its express terms foreclose the Arbitrator's reasoning. Ex. 2, CBA. The CBA provides that the disciplinary options available to ONEOK "are not sequential"; that a potentially terminable offense triggers "an automatic suspension with pay pending an investigation" that "determines the appropriate final action/outcome, up to and including termination"; that some

[1] A "pre-audit" is a preparatory internal review of a facility's safety records, combined with a physical inspection of the facility, conducted to verify compliance with ONEOK's safety policies (its System Integrity Plan) and to confirm readiness for an upcoming formal internal safety audit.

conduct is "severe enough to warrant immediate termination"; that "[t]he Company reserves the right to discharge . . . an employee for just cause"; that the arbitrator "cannot add to, modify, delete, or otherwise change any provision of this Agreement"; and that "[t]he expense of the arbitrator shall be borne equally by the parties." The Award contradicts each of those provisions.

5. Because the Award exceeds the scope of the parties' submission and the Arbitrator's authority under Article X, fails to decide the question submitted, does not draw its essence from the CBA, rests on factual premises the record does not support, grants relief on matters no one submitted, and compels the unconditional reinstatement of a safety-sensitive pipeline operator in conflict with federal pipeline-safety policy, ONEOK seeks an order vacating the Award under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and, to the extent applicable or as guidance, Sections 10(a)(4) and 11(b) of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 10(a)(4), 11(b), together with related declaratory relief. At a minimum, ONEOK seeks vacatur or modification of Paragraphs 5 through 8 of the Award.

## PARTIES

6. ONEOK is an Oklahoma corporation with its principal place of business in Tulsa, Tulsa County, Oklahoma. ONEOK operates interstate pipelines that transport refined petroleum products, including jet fuel, diesel fuel, and gasoline.

7. Magellan Midstream Holdings GP, LLC is the employer signatory to the CBA. ONEOK acquired Magellan in 2023. Following the acquisition, legacy Magellan employees represented by the Union, including Mr. Wooley, became ONEOK employees. ONEOK is the successor employer under the CBA with respect to the legacy Magellan operations and employees described in Article I of the CBA, and it has administered the CBA, including the grievance and arbitration procedures at issue here, in that capacity.

8. ONEOK discharged Mr. Wooley, responded to the Union's grievance, Ex. 3, Grievance Documents at Jt. Ex. 2.3, and appeared and participated as the employer party in the arbitration, captioned "United Steel Workers (USW) Local Union No. 348 and ONEOK." Ex. 4, Transcript of July 23, 2026 Arbitration Hearing ("Tr.") at 1. Although the Award is captioned against Magellan, the obligations it purports to impose fall on ONEOK. Ex. 1, Award § IX.

9. The International is a labor organization within the meaning of 29 U.S.C. § 152(5) that represents employees in an industry affecting commerce. The International is a party to the CBA. It acts through staff representatives who administer grievances and arbitrations under the CBA on behalf of Local 348, including International Staff Representative Robert Tripp, who was involved in processing the grievance at issue and served as the Union's advocate at the arbitration hearing. Ex. 3 at Jt. Ex. 2.4–2.6; Ex. 4, Tr. 2, 6:16–19.

10. Local 348 is a labor organization within the meaning of 29 U.S.C. § 152(5). It is a party to the CBA, maintains its principal office at 319 Orchard Street, Kansas City, Kansas 66101 and represents bargaining-unit employees of ONEOK's legacy Magellan operations. Local 348 acts through its officers and agents, including its President, Christie Breedlove, who also serves as President of the General Workers' Committee ("GWC") established under Article III of the CBA. Ex. 3 at Jt. Ex. 2.1–2.2; Ex. 4, Tr. 6:20–21, 28:22–29:2.

11. Each Defendant may sue and be sued as an entity under 29 U.S.C. § 185(b), and service of process upon an officer or agent of a labor organization, in that capacity, constitutes service upon the organization. 29 U.S.C. § 185(d).

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and Section 301(a) of the LMRA, 29 U.S.C. § 185(a), because this is a suit for violation of a contract between an

employer and labor organizations representing employees in an industry affecting commerce, and it seeks to vacate an arbitration award issued under that contract. ONEOK's interstate pipeline operations are in an industry affecting commerce within the meaning of 29 U.S.C. §§ 142(1) and 152(7).

13. Because ONEOK's claims arise under Section 301, the basis for federal jurisdiction appears on the face of this Complaint, independent of the FAA. Although the FAA does not govern collective bargaining agreements of its own force, federal courts look to it for guidance in Section 301 actions, and ONEOK invokes its standards on that basis and, to the extent the FAA is held to apply, as an additional basis for relief.

14. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 because an actual controversy exists between the parties concerning ONEOK's obligations under the CBA and the Award.

15. This Court has personal jurisdiction over each Defendant. Each Defendant has purposefully directed its activities to Oklahoma by representing ONEOK employees who work in Oklahoma, including at ONEOK's Tulsa operations; by administering the CBA, including its grievance and arbitration procedures, with an employer headquartered in Tulsa; and by acting in Tulsa through officers and agents, including Local 348's President, who is employed in ONEOK's legacy Magellan operations in Tulsa and who submitted and processed the grievance at issue, and the International's Staff Representative, who regularly travels to Tulsa to conduct Union business and to participate in arbitration hearings under the CBA. The CBA's coverage expressly includes ONEOK's pipeline control center in Tulsa, Oklahoma. Ex. 2, CBA art. III, ¶ 3. ONEOK's claims arise out of and relate to these contacts.

16. Venue is proper in this District under 29 U.S.C. § 185(c), which provides that a

district court shall be deemed to have jurisdiction of a labor organization "in any district in which its duly authorized officers or agents are engaged in representing or acting for employee members," because the Union's duly authorized officers and agents are engaged in representing and acting for employee members in Tulsa, Oklahoma.

17. Venue is also proper under 28 U.S.C. § 1391(b)(1) and (c)(2) because each Defendant is subject to personal jurisdiction in this District with respect to this action and therefore resides here for venue purposes. To the extent the FAA applies, its venue provisions are permissive and do not restrict venue to the district in which the Award was made.

## TIMELINESS, FINALITY, AND STATUTORY NOTICE

18. The Award is undated. The Arbitrator transmitted it by email to counsel for ONEOK and to the Union's Staff Representative on Friday, October 9, 2026, under the subject line "Award and Invoice for *impasse*[2] dispute between Magellan Pipeline and United Steel Workers." Ex. 1, Award (emphasis added).

19. ONEOK files this action fewer than sixty days after it received the Award, within the

---

[2] The Arbitrator mischaracterized this case as an "impasse dispute" at least three times: (1) in an email *prior* to the hearing, (2) in the subject line of his Award transmittal email ("Award and Invoice for impasse dispute between Magellan Pipeline and United Steel Workers"); and (2) in Section IX, paragraph 4 of the Award itself, which orders ONEOK to remove from Mr. Wooley's personnel record "all evidence of discipline related to this impasse dispute." Ex. 1, Award. *These erroneous references are not trivial, harmless mistakes*. *They are indicative of the serious problem leading to this Complaint*. An "impasse" (or "interest") dispute is a bargaining dispute over what the terms of a new or renewed collective bargaining agreement should be; because no contract yet governs, the impasse Arbitrator writes new terms, and no contractual standard applies to the Arbitrator's decision-making role. This case is the opposite of an impasse dispute. This case is a "rights" (grievance) arbitration under an existing CBA, in which the Arbitrator's authority is limited to interpreting and applying the agreement's terms to the discharge, and he "cannot add to, modify, delete, or otherwise change any provision of this Agreement." Ex. 2, CBA art. X. Here, the Arbitrator's repeated use of the "impasse" label is consistent with his departure from the submitted question and his creation of new procedural requirements found nowhere in the CBA and that he wrongly used to justify his decision to sustain the grievance.

three-month period prescribed by 9 U.S.C. § 12, and within any limitations period the Court may apply.

20. The Award finally resolves the only grievance and the only issue submitted: it sustains the grievance and orders specific remedies. Ex. 1, Award § IX. The Arbitrator reserved jurisdiction only over "question[s] on the implementation of this award," and only for "sixty (60) days after the parties' receipt, and an additional sixty (60) days after implementation." *Id.* That reservation leaves no question of liability or remedy undecided. Neither party requested clarification within the fourteen-day period the Award specified.

21. The Union has inquired about returning Mr. Wooley to work under the Award. ONEOK has declined to reinstate him pending this Court's review, because his reinstatement would return him to safety-sensitive work at a federally regulated pipeline facility.

22. The parties exhausted the grievance procedure. The Union filed its grievance on September 15, 2025; ONEOK denied it in writing on October 2, 2025; and the Union advanced it to arbitration. Ex. 3, Grievance Documents at Jt. Ex. 2.1–2.6. No question of arbitrability was raised. Ex. 6 ("Union Br.") § II.

23. This Complaint constitutes ONEOK's application to vacate the Award and its notice of motion to vacate and, in the alternative, to modify the Award under 9 U.S.C. §§ 10, 11, and 12. ONEOK is filing its separate *Motion to Vacate Arbitration Award and Brief in Support* contemporaneously with this Complaint and will serve the Motion and this Complaint, with summonses, on each Defendant in the manner required by Federal Rule of Civil Procedure 4, 29 U.S.C. § 185(d), and, to the extent applicable, 9 U.S.C. § 12.

## FACTUAL ALLEGATIONS

### A. The Collective Bargaining Agreement

24. The CBA is an agreement between Magellan and the International and Local 348, effective February 1, 2022. Ex. 2. It was the agreement in effect at the time of Mr. Wooley's suspension and discharge. Ex. 4, Tr. 67:2–5. The parties stipulated to its admission at the arbitration hearing as Joint Exhibit 1. *Id*. at 92:11–15.

25. Article IX establishes the grievance procedure. It requires that a grievance "state the specific Article(s) and Section(s) of Agreement that has been violated" and "state the remedy sought by the grievant(s)." Ex. 2, CBA art. IX, §§ 2(c)–(d), at 21. For a discharge, Article XI, Section 2 further provides that the complaint "shall state the facts with reasonable definiteness upon which the employee relies to substantiate his/her claim that his/her discharge, suspension or layoff was unjust." Ex. 2, CBA art. XI, § 2, at 23.

26. Article X governs arbitration. It provides that "[a] grievance that has been processed in accordance with the provisions of the Article IX or Article XI, Paragraph 2 of this Agreement, but not satisfactorily settled, shall, upon the written request of the party desiring arbitration, be submitted to arbitration by an impartial arbitrator" selected from a panel furnished by the Federal Mediation and Conciliation Service. Ex. 2, CBA art. X, § 1, at 22.

27. Article X expressly limits the arbitrator's authority: "The Arbitrator is restricted to interpreting, applying and determining any violation of the performance and/or provisions of this Agreement and cannot add to, modify, delete, or otherwise change any provision of this Agreement." Ex. 2, CBA art. X, § 2, at 22.

28. Article X also allocates the costs of arbitration. It provides that "[t]he expense of the arbitrator shall be borne equally by the parties," and, again, that "[t]he cost of the arbitrator, hearing room, and refreshments, shall be borne equally by the parties, except that each party

shall be responsible for additional costs relating to their witnesses or representatives at the hearing." Ex. 2, CBA art. X, §§ 1(d), 4, at 22. No provision of the CBA authorizes an arbitrator to rewrite any provision of the CBA or shift either party's attorney or representative fees, or the arbitrator's fees, to the other party.

29. Article XI governs discipline. Section 1 provides:

> The disciplinary flow chart found in Exhibit C defines the disciplinary process agreed to by the Company and the Union. Various actions may be taken, depending on the severity of the incident. The *options* outlined in Exhibit C are *not sequential*, meaning that some instances may result in a coaching discussion and no discipline at all, while others may warrant a written warning and a day off without pay, or either option in-between. Each incident will be reviewed on a case-by-case basis, taking into consideration the tenure and recent performance history of the employee, as well as the severity of the incident.

Ex. 2, CBA art. XI, § 1, at 23 (emphasis added).

30. Exhibit C to the CBA is the disciplinary flow chart that Article XI incorporates. It identifies the available disciplinary options: a Level I verbal warning, a Level II reprimand, and, for a potentially terminable offense, "an automatic suspension with pay pending an investigation," after which the "[i]nvestigation determines the appropriate final action/outcome, up to and including termination." Ex. 2, CBA Ex. C, at 62; Ex. 4, Tr. 70:2–72:4; 74:9–18; 96:11–13. Exhibit C's notes further provide that "in some instances, a day off without pay will not apply if the employee's actions were severe enough to warrant immediate termination," and that, although steward participation is recommended at the earlier steps, "[i]t is the responsibility of the employee to request representation." Ex. 2, CBA Ex. C, at 63.

31. Article XI, Section 2 requires that an employee who is discharged, suspended, or laid off as a disciplinary measure receive, within seventy-two hours, a written notice "setting forth the reason for" the action, with a copy to the GWC. Ex. 2, CBA art. XI, § 2, at 23; Ex. 4, Tr.

69:4–16. Section 2 is a written-notice requirement. It does not require a hearing before discipline is imposed.

32. Article XI, Section 5 provides: “The Company reserves the right to discharge, suspend or lay off an employee for just cause.” Ex. 2, CBA art. XI, § 5, at 24. Article XXVI likewise reserves to the Company the right “to maintain order and suspend, demote, discipline and discharge employees for just cause.” Ex. 2, CBA art. XXVI, at 45.

33. Article XXII, Section 10 provides: “All employees shall observe safety rules and practices as promulgated by the Company.” Ex. 2, CBA art. XXII, § 10, at 40; Ex. 4, Tr. 83:4–14.

34. No provision of the CBA (a) requires ONEOK to impose progressive discipline before discharge; (b) requires a hearing before discipline is imposed; (c) requires advance notice of “the time, place, and nature” of any hearing; (d) gives an employee a right to confront or cross-examine witnesses before discipline is imposed; (e) establishes a “Progressive Discipline Policy” separate from the non-sequential disciplinary options available under Article XI and Exhibit C; (f) provides that ONEOK shares its right to discharge with the Union; or (g) authorizes an arbitrator to shift fees or costs.

**B. The Capehart Terminal and the Federally Regulated Operator Role**

35. ONEOK’s Capehart, Nebraska terminal receives jet fuel off the pipeline into three 25,000-barrel tanks, certifies each batch, and delivers it by truck loading rack and by pipeline to Offutt Air Force Base. Ex. 4, Tr. 108:7–109:1; 231:15–232:14. Capehart is a remote location manned by a single operator, and Mr. Wooley was that operator. *Id.* at 109:9–22; 110:14–20; 128:19–21. Because remote operators work with “very low supervision,” ONEOK must be able to trust that they perform and document their safety tasks. *Id.* at 111:17–24.

36. ONEOK's pipeline operations are regulated by the Pipeline and Hazardous Materials Safety Administration ("PHMSA") of the U.S. Department of Transportation and by state agencies, which require ONEOK to prove that safety-critical tasks were completed. Ex. 4, Tr. 105:7–14; 123:13–124:23. Under ONEOK's System Integrity Plan ("SIP"), a safety task is not "completed until the form is completed and filed," and operators are trained that all safety records are auditable at any time and that failing to perform or document critical safety tasks is "grounds for dismissal." *Id.* at 107:24–108:1; 126:16–127:3.

**C. The Pre-Audit, the Paid Suspension, the Investigation, and the Discharge**

37. In late July 2025, a pre-audit team led by Nick Armijo, who had conducted at least 20 pre-audits since 2018, reviewed the Capehart records and facility for compliance with SIP. Ex. 4, Tr. 126:6–15; 128:9–18. Mr. Armijo testified that the Capehart pre-audit "was by far the worst [he had] ever seen," because "almost every single category that [they] were looking at was either missing documents, the documents were filled out incorrectly or they were falsified." *Id.* at 131:8–22.

38. Mr. Wooley told the pre-audit team that he had completed the required pig runs and the annual thermal-relief testing. *Id.* at 154:3–12; 175:20–178:12. But the undisturbed paint on the pig-trap valve, plug, and door—painted in 2024, with the door's chain "paint welded" to the door—showed that the trap had "never been operated," and the paint on the thermal-relief dust cover and valves was likewise undisturbed. *Id.* at 154:19–155:18; 157:11–158:23; 160:12–170:1; 175:20–178:12. As Mr. Armijo testified, there was "no humanly possible way that that pig trap door has been opened." *Id.* at 167:25–168:8. Mr. Wooley could also produce only three of the 100 to 200 authorization-to-work permits expected for the year, and those were almost entirely incomplete. *Id.* at 181:3–184:16.

39. On July 31, 2025, ONEOK gave Mr. Wooley written notice that it had determined that his "failure to produce documentation associated with procedures to perform such tasks as ATW, lockout/tagout, pigging operations, additive calibration and other tasks associated with operations at the Capehart facility, meaning we cannot currently confirm whether these procedures were actually performed, arises to a potentially terminable offense," and that ONEOK was therefore "initiating an automatic suspension with pay . . . pending the outcome of an investigation." Ex. 4, Tr. 29:3–30:3. The notice cited Article XI, Section 2 and was copied to the GWC President, Ms. Breedlove, as required by the CBA. *Id*. at 28:22–29:2; 30:12–21.

40. Destiny Butler, an Employee Relations Partner, conducted the investigation. Before the investigative interview, she asked Mr. Wooley whether he wanted representation, and he declined. *Id*. at 41:3–15. She interviewed him for approximately four hours, walking through each policy violation. *Id*. at 41:16–42:3. He "admitted to most" of the violations and did not deny knowing his responsibilities under the applicable policies. *Id*. at 45:2–46:1.

41. Ms. Butler also tested Mr. Wooley's explanations for certain violations—workload, supervisor turnover, lack of support, and a facility remodel—by interviewing his coworkers, supervisor, and manager, and by searching for any call, text, or email in which he had requested help. She found none. Where the evidence supported an explanation, ONEOK credited it and excluded that finding from its discharge decision. *Id*. at 46:2–48:4; 52:1–23. Ms. Butler presented her findings to Mr. Wooley's chain of command, from his supervisor through the Vice President, together with Human Resources and Legal. *Id*. at 64:5–65:11.

42. On August 27, 2025, ONEOK discharged Mr. Wooley by written notice. *Id*. at 139:1–15. The notice identified seven categories of safety-documentation failures as the grounds for discharge: loading-rack meter proving, semi-annual tank overfill protection inspections, semi-

annual pig runs, semi-annual additive injector calibration, quarterly additive tank bottom sampling, annual overpressure protection and thermal-relief testing, and authorization-to-work and lockout/tagout documentation for opening filter vessels. It stated that ONEOK had "considered [Mr. Wooley's] length of employment, performance history and the seriousness of [his] conduct," and, "[c]onsistent with Article XI, Paragraph 2," served as the "written notification setting forth the reason for this discharge," with copies to the GWC President. It does not rely on any prior discipline.

43. ONEOK's leadership team concluded it could no longer trust Mr. Wooley in a safety-sensitive role, given the number and severity of the violations and the evidence that he had claimed to perform safety-critical work that had not been performed. Ex. 4, Tr. 65:6–25; 83:21–84:17.

**D. The Grievance**

44. On September 15, 2025, Ms. Breedlove submitted a grievance stating: "The company terminated the employee with lack of cause." Ex. 3 at Jt. Ex. 2.2. It requested that ONEOK "[r]einstate employee and pay all backpay and benefits," "cease and desist from violating the Collective Bargaining Agreement," that "the incident(s) be rectified," and that "those affected be made whole in every respect." *Id*.

45. The grievance did not allege that Mr. Wooley was denied due process in any way or that he was denied notice of the charges or violations at issue, a hearing, the opportunity to confront or cross-examine witnesses, or any other procedural right. *Id*. It did not request attorney or representative fees, costs, a change to any disciplinary policy, or relief for retaliation or discrimination. *Id*.

46. On October 2, 2025, ONEOK's Human Resources Business Partner responsible for

labor relations, Chris Matousek, denied the grievance in writing. Ex. 3 at Jt. Ex. 2.3. Her response recorded the Union's sole position on the issue: "The union indicated that Mr. Wooley did not have prior disciplinary action and that *Mr Wooley should have been given progressive disciplinary action*." *Id.* (emphasis added). She explained that the discharge "was for just cause under the contract" and that "[t]he contract also allows management the right to determine the appropriate level of disciplinary action, which may include taking action beyond progression of each step of discipline as outlined in Article XI and the progressive flow chart in Exhibit C." *Id.*

47. Mr. Tripp responded that the Union was "going to proceed to the next step," and later that the Union "intends to move the Wooley grievance to the next Step of the procedure." *Id.* at Jt. Ex. 2.4–2.6. The Union did not dispute ONEOK's statement of the Union's narrow position or assert any other basis for the grievance.

## E. The Arbitration Hearing

48. The parties selected Arbitrator Nash pursuant to the selection process governed by Article X of the CBA, and the matter was docketed as FMCS No. 26-1121-01314. Ex. 4, Tr. 1; 5:3–9. The Arbitrator conducted a full-day evidentiary hearing on July 23, 2026, which a court reporter transcribed. Ex. 4, Tr. 1–262. The Arbitrator described the proceeding as "a discipline hearing" and told the parties that each side would have "the opportunity to cross-examine the evidence that was presented by the other party." *Id.* at 11:5–12:9. The Union cross-examined both of ONEOK's witnesses, and Mr. Wooley testified in his own defense. *Id.* at 93:11–102:8; 190:1–196:21; 201:6–204:3; 210:4–211:3; 226–241; 251:5–252:6.

49. In its opening statement, ONEOK explained that the CBA "grants ONEOK authority to immediately terminate an employee rather than going through the steps of progressive discipline when the nature and severity of the offense warrants immediate termination." *Id.* at

16:12–23. When the Arbitrator asked whether going directly to termination was "consistent -- with the progressive discipline policy," ONEOK's counsel explained that Article XI "says that there's not a progressive discipline policy"; that the options in Exhibit C "are not sequential, meaning it doesn't impose a mandatory progressive discipline step"; and that in "many arbitration cases over the years," the Union has "never disputed that the company has the right to skip steps and go straight to termination." *Id*. at 72:8–75:10. The Union did not dispute or contradict counsel's explanation of Article XI.

50. ONEOK's counsel told the Arbitrator: "The only thing that's really in dispute here is whether termination was *the proper penalty*," which is the fifth of five just-cause factors that arbitrators often look to when evaluating just cause. *Id*. at 79:12–15 (emphasis added); Ex. 5, ONEOK's Post-Hearing Brief ("ONEOK Br.") at 10, 14–16. Counsel repeated that "they don't have a progressive discipline policy, but what they do have is . . . a clear agreement with the union that's never been in dispute in any prior arbitrations that management has the right to determine the appropriate degree of discipline to be imposed." Ex. 4, Tr. 80:23–81:5, 97:1–7. Critically, the Union did not disagree with either statement. The only disciplinary process for represented employees identified at the hearing was Article XI and Exhibit C. *Id*. at 96:16–98:23.

51. The Union offered no contrary reading of Article XI or Exhibit C. Neither in its cross-examination of ONEOK's witnesses nor in its direct examination of Mr. Wooley did the Union contend that Mr. Wooley lacked notice of the charges, that he was entitled to a hearing before discharge, or that he was entitled to confront or cross-examine anyone before discharge. The Union's examination of Mr. Wooley instead focused on his workload and assignments and on the absence of any prior discipline or warning—alleged mitigating circumstances that the Union believed warranted a lesser degree of discipline than immediate discharge. Ex. 4, Tr. 226–234.

Mr. Wooley testified that he had "[n]ever" been formally disciplined: "No verbals, no written, no." *Id.* at 232:15–233:2.

52. The Arbitrator himself raised the issue of whether Mr. Wooley had been afforded various pre-discharge "rights" that are nowhere to be found in the CBA and that were never raised by the Union. For example, the Arbitrator asked whether Mr. Wooley had "the opportunity to face his accusers and to do -- essentially what we did here, cross-examine his accusers." *Id.* at 218:20–219:1, 221:3–11. In response, ONEOK's counsel explained that Mr. Wooley "didn't have accusers"; the evidence consisted of "the results of the preaudit findings," which Ms. Butler presented to him in a four-hour interview in which he could "explain everything about each one of those issues." *Id.* at 219:2–222:15.

**F. The Post-Hearing Briefs**

53. ONEOK filed its post-hearing brief on September 4, 2026. Ex. 5. It stated the issue as follows: "The issue is whether ONEOK had just cause to discharge Matthew Wooley and, if not, what is the proper remedy?" *Id.* at 1.

54. The Union filed its post-hearing brief on or about September 4, 2026. Ex. 6, Union Br. It stated the issue as follows: "Did the Company have just and proper cause to discharge the grievant, Matthew Wooley? If not, what is the appropriate remedy?" *Id.* at § II.

55. The Union argued, as it had during the grievance process, that Mr. Wooley's violations were mere "poor Workmanship" issues and that "[t]o meet the 'just cause' standard, cases of poor workmanship should have progressive discipline applied. Verbal and Written warnings . . . ." *Id.* at § IV. It conceded that "employees can be terminated on the first offense on a range of issues," but argued that "[t]hese types of workmanship errors[] must be handled with progressive discipline." *Id.* The Union also described Mr. Wooley's record as having "no record

of discipline," attributed the violations to understaffing and workload, and argued that the accusations were "overstated by management." *Id*. Each of those arguments went to the sole, narrow issue of the proper penalty: whether discharge or merely a "warning" was just.

56. Consistent with its position during the grievance process and at the hearing, the Union's brief did not contend that Mr. Wooley lacked notice of the charges; that he was entitled to but deprived of a hearing, confrontation, or cross-examination before discharge; that ONEOK violated any procedural provision of the CBA; that any "Progressive Discipline Policy" exists; that ONEOK retaliated or discriminated against anyone for protected activity; or that the discharge violated any statute. Ex. 6, Union Br. It did not request any fees, costs, reallocation of the Arbitrator's fees, a review of any disciplinary policy, or an anti-retaliation order.

57. ONEOK's brief addressed the evidence establishing all of the traditional just-cause factors, focusing most heavily on the proper penalty and observing that it "is where the Union focused and where the Arbitrator probed the issue of progressive discipline." Ex. 5, ONEOK Br. at 14. Because the Arbitrator had asked questions about the investigation at the hearing, ONEOK's brief also described, as one element of the just-cause analysis, the investigation ONEOK had conducted. *Id*. at 12–14. The Union's brief did not contest that showing. Neither brief asked the Arbitrator to decide whether the CBA required a pre-discharge hearing with advance notice, confrontation, and cross-examination.

## G. The Award

58. The Award states that "[b]ecause the parties were unable to reach an agreement on the manner in which the issues should be framed, the Arbitrator exercised his prerogative as the disinterested party in this forum and framed the issues based on his understanding of the dispute." Ex. 1, Award § II. It frames the issue as: "Whether the parties violated the CBA,

policies, Articles, or applicable law; If so, what shall be the remedy?" *Id.* The parties' briefs, however, stated the issue in substantially the same words, and neither asked the Arbitrator to decide whether anyone violated "policies" or "applicable law." Exs. 5, 6. The Arbitrator did not announce his reframed issue before issuing the Award.

59. The Award mischaracterizes the grievance as concerning Mr. Wooley's termination "without having provided him the advantages of a full and fair investigation precedent to the assessment of discipline associated with a prior suspension, and written reprimand as required by the CBA." Ex. 1, Award § I. The grievance says nothing of the kind, Ex. 3 at Jt. Ex. 2.2, and the Union never took that position.

60. The Award incorrectly states that "[t]he Employer did, acknowledge, however that no full and fair investigation was either scheduled or convened; nor – according to the Employer – was one required – since the Grievant admitted to some violations." Ex. 1, Award § III. ONEOK made no such acknowledgment. ONEOK's witnesses described the investigation in detail, and ONEOK's brief showed how the evidence of the investigation it conducted prior to making the decision to discharge Mr. Wooley fully satisfied the requirements of the CBA. Ex. 4, Tr. 28:22–30:21, 41:3–48:4, 52:1–23, 64:5–65:11; Ex. 5, ONEOK Br. at 12–14.

61. The Award imposes requirements found nowhere in the CBA, including that "[t]he time, place, and nature of the hearing should be brought to the attention of the persons charged," Ex. 1, Award § III, and that, as "important criteria for determining 'Just Cause,'" the grievant be "provided the opportunity to face his/her accusers and the witnesses who provided evidence for the opposing party, and allowed to test the truthfulness – via cross-examination – of such evidence," and be "given prior and proper notification – in writing – of the nature, time, date, and location of the alleged infractions." Ex. 1, Award § VIII. The Union never raised any of

these issues during the grievance process, at the hearing, or in its post-hearing brief, and the CBA does not require any of them.

62. The Award contains passages addressing matters that were not before the Arbitrator, including an employer's attempt to avoid "group rights" through "individual agreements with individual employees"; an employee's "waiver/release/resignation"; and the rule that "[w]here the individual advanced his case to arbitration, and it was dismissed, such a dismissal is final and binding even if, later, advanced to arbitration by the Organization." Ex. 1, Award § III. No individual agreement, waiver, release, resignation, or prior arbitration was at issue.

63. The Award's summary of the Union's position recites only the Union's contentions about mitigating circumstances that it believed warranted a "warning" instead of discharge, such as staff turnover, retirements, territory size, workload, record-keeping volume, and unheeded requests for assistance. Ex. 1, Award § IV. It does not attribute to the Union any contention about a lack of notice, hearings, confrontation, or cross-examination. That is because the Union raised no such issues.

64. The Award bundles together a smattering of statements that are not contained in and reasonably cannot be inferred from the CBA and that, importantly, were not raised by the Union, such as "the Progressive Discipline Policy is a house constructed by both parties"; that "Exhibit C clearly established the connection between an event that is potentially, terminable, and that event's rightful placement, conspicuously, displayed on the Progressive Discipline Policy"; and that "Articles X and XI strengthened that inseparable bond by emphasizing the Employer's misguided belief that it retains the unilateral right to alter the implementation of its Progressive Discipline Policy – notwithstanding the CBAs requirement to convene a full and fair investigation precedent to the assessment of discipline." Ex. 1, Award § V.

65. The Award states that "Grievant Wooley's prior disciplines at the levels of reprimand and suspension, with-pay, were used to predicate, to fortify, and to usher through the published, and relied upon Progressive Disciplinary process, subsequent – NOT PRECEDENT – to an assessment of discipline at the level of permanent dismissal." Ex. 1, Award § V. Yet, the Award cites no exhibit or testimony for that statement. The termination notice does not rely on any prior discipline, Ex. 4, Tr. 139:1–15; the only suspension in the record is the paid suspension pending investigation that Exhibit C prescribes for a potentially terminable offense, *id.* at 29:3–30:3; Mr. Wooley testified that he had never been formally disciplined, *id.* at 232:15–233:2; and the Union's own brief described his record as including "no record of discipline." Ex. 6, Union Br. § IV.

66. The Award concludes that "[t]he Employer violated its own Progressive Discipline Policy as well as" an arbitration decision (Enterprise Wire Co., 46 LA 359 (Daugherty 1966)), a treatise (Elkouri & Elkouri, How Arbitration Works), an Ohio public-employment decision (Reading v. Fraternal Order of Police, 2020-Ohio-4558), a Federal Labor Relations Authority decision (U.S. Department of Housing and Urban Development, 73 FLRA No. 67 (2022)), and "Social Security Administrative Office of Hearings and Appeals." Ex. 1, Award § VII. But it cites no provision of the CBA as the source of any procedural requirement that ONEOK purportedly violated. It also faults ONEOK for failing to ensure that "the cumulative value was added, correctly, and the total amount assessed . . . was consistent with the published assessment," *id.*, although the CBA contains no point system or "published assessment."

67. The Award states that "the Employer has the right – under the CBA, *and together with the Union* - to determine discipline." Ex. 1, Award § VIII (emphasis added). But Article XI, Section 5 provides that "[t]he Company reserves the right to discharge," and Article XXVI

reserves discipline and discharge to the Company. Ex. 2, CBA art. XI, § 5, at 24; *id*. art. XXVI, at 45. The Union never argued to the contrary.

68. The Award describes the dispute as "a Fundamental Due Process Failure Embedded in the parties' Progressive Discipline System"; states that "[t]he Arbitrator's focus here is not whether the Grievant would have failed or prevailed"; states that "[t]he Arbitrator cannot cure the denial of a full and fair investigation by attempting – after the fact – to determine whether the issues in the earlier accusations . . . were true or false"; and concludes that "the Employer's denial to provide the required procedural progression makes the reliable merits determination impossible at this point." Ex. 1, Award § VIII. But the Union never questioned whether Mr. Wooley received due process or a full and fair investigation.

69. The Award acknowledges ONEOK's argument "that the only standard that must be met, here, is Just Cause," and states: "While that argument might well be true, it strikes this Arbitrator as an irony on top of a paradox – since Just Cause cannot possibly be achieved without proper and timely notification of charges – along with several other important and required procedural requirements – relied upon, agreed to, and published." Ex. 1, Award § VIII. But the Award does not identify where any such requirement was "agreed to" in the CBA or "published." Nor does the Award point to a single instance when the Union raised the issue of "proper and timely notification of charges" or ONEOK's alleged failure to comply with "several other important and required procedural requirements." Again, that is because the Union never raised any such issues. The Award also states that "[t]he Arbitrator's job is enforcement of the contract" and that rewriting the agreement would be "a result that goes well beyond this Arbitrator's authority," *id*., yet the Award contradicts the contract at every turn and effectively rewrites it.

70. The Award states that "[a] subsidiary argument advanced by the Employer is that the severity of the alleged infractions is of lesser import," and that the Union "abdicated its right and responsibility . . . in conceding to the Employer the right to, unilaterally, alter the implementation of the Progressive Discipline Policy." Ex. 1, Award § VIII. ONEOK, however, made the opposite argument: that the severity of the violations warranted discharge. Ex. 5, ONEOK Br. at 1, 15. And the Union freely exercised its right to negotiate a disciplinary process that allows the company non-sequential disciplinary options it may choose on a case-by-case basis depending on various factors, such as the severity of the offense. The Arbitrator is not free to ignore the parties' agreement reflected in the CBA. He is bound by it.

71. The Award provides:

> 1. This grievance is sustained.
>
> 2. The Employer shall reinstate Grievant, M. Wooley, to the position he occupied prior to his illegal termination.
>
> 3. The Employer shall make M. Wooley whole for all lost pay, benefits, seniority, health, sickness, and other benefits to which he would have been entitled, absent his illegal termination, effective as of the date of termination. Make whole relief includes maximum allowable interest on back pay.
>
> 4. The Employer shall remove from Grievant's Personnel record all evidence of discipline related to this impasse dispute.
>
> 5. The Employer shall refrain from retaliation or discrimination of Union Employees engaging in protected Union activity.
>
> 6. The Employer shall review and validate its Progressive Discipline Policy to ensure its congruence and compliance with its CBA.
>
> 7. The Employer shall reimburse the Union for reasonable attorney and representative fees and other documented costs associated with this arbitration hearing. The Union shall, also, submit to the Employer – within thirty (30) days of the date of this award – all amounts due and owed to the Arbitrator.
>
> 8. The Employer shall honor the amount owed the Arbitrator in fees - in not more than fifteen (15) days, thereafter.

Ex. 1, Award § IX.

72. The Award orders reinstatement without any condition, including any requalification, evaluation, or retraining before Mr. Wooley returns to safety-sensitive duties. *Id*.

### H. Federal Pipeline-Safety Requirements

73. Federal regulations require pipeline operators to maintain a written qualification program for individuals who perform "covered tasks," which include operations and maintenance activities that affect the operation or integrity of the pipeline. 49 C.F.R. §§ 195.501, 195.503, 195.505. The program must ensure through evaluation that individuals performing covered tasks are qualified, and it must provide for evaluating an individual when the operator has reason to believe the individual is no longer qualified to perform a covered task. *Id.* § 195.505(b), (e). Operators must also maintain records of operator qualification. *Id.* § 195.507.

74. Federal regulations further require operators to inspect and test pressure-limiting and relief devices and overfill protection systems at prescribed intervals, and to retain records of each required inspection and test. 49 C.F.R. §§ 195.404(c), 195.428.

75. The Award orders ONEOK to return Mr. Wooley, without condition, to "the position he occupied prior to his . . . termination"—that of sole qualified operator at a jet-fuel terminal—and to remove from his personnel record "all evidence of discipline related to this impasse dispute." Ex. 1, Award § IX ¶¶ 2, 4.

## CLAIMS FOR RELIEF

## COUNT I

### Vacatur
### The Arbitrator Exceeded the Scope of the Submission and His Authority Under the CBA
### (29 U.S.C. § 185; 9 U.S.C. § 10(a)(4))

76. ONEOK incorporates paragraphs 1 through 75.

77. An arbitrator's authority is limited to the issues the parties submit. Parties may limit

that authority by submitting a precise statement of the issues or by providing express limitations in the collective bargaining agreement, and where they have done either, courts owe no deference to an award that extends beyond those limits. *HollyFrontier Cheyenne Ref., LLC v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union Loc. 11-574*, 132 F.4th 1184, 1188–89 (10th Cir. 2025).

78. Both limits are present here. *First*, the parties submitted a single, precisely stated issue: whether ONEOK had just cause to discharge Mr. Wooley and, if not, the appropriate remedy. The grievance, the Union's stated position during the grievance procedure, the parties' statements at the hearing, and the parties' post-hearing briefs confirm that the dispute concerned one narrow question: whether the penalty of discharge or some lesser degree of discipline such as a warning was the proper penalty. As in *HollyFrontier*, any difference in the wording of the parties' issue statements is "without a difference." 132 F.4th at 1188.

79. *Second*, Article X, Section 2 confines the Arbitrator to "interpreting, applying and determining any violation of the performance and/or provisions of this Agreement." And Articles IX and XI, Section 2 confine a discharge grievance to the Articles and facts the grievance states. During the grievance process, at the hearing, and in its post-hearing brief, the Union confined its issue to one simple matter—whether Mr. Wooley should have received a warning instead of being discharged.

80. The Arbitrator disregarded both limits. He invented his own issue and sustained the grievance on his invented ground.

81. The Arbitrator likewise awarded relief on matters no party submitted, including an anti-retaliation order, a directive to review and validate a disciplinary policy, a determination that the discharge was "illegal," and the shifting of attorney, representative, and arbitrator fees. Ex. 1,

Award § IX ¶¶ 2–3, 5–8.

82. Because the Award resolves issues the parties did not submit and exceeds the limits Article X places on the Arbitrator, the Arbitrator exceeded his powers, and the Award must be vacated under 29 U.S.C. § 185 and, to the extent applicable, 9 U.S.C. § 10(a)(4).

**COUNT II**

**Vacatur**
**The Arbitrator Did Not Decide the Issue Submitted**
**(29 U.S.C. § 185; 9 U.S.C. § 10(a)(4))**

83. ONEOK incorporates paragraphs 1 through 82.

84. Section 10(a)(4) of the FAA, to which courts look for guidance in Section 301 actions, authorizes vacatur where an arbitrator "so imperfectly executed" his powers "that a mutual, final, and definite award upon the subject matter submitted was not made."

85. The submitted issue required the Arbitrator to decide, on the evidentiary record, whether ONEOK had just cause to discharge Mr. Wooley or whether some lesser penalty was warranted. He had the benefit of a full-day hearing, a transcript of 262 pages, the parties' testimony and exhibits, and post-hearing briefs from both sides. Ex. 4, Tr. 1–262; Exs. 5, 6.

86. But the Arbitrator declined to decide the issue submitted to him. He stated that "[t]he Arbitrator's focus here is not whether the Grievant would have failed or prevailed," that he could not "determine whether the issues in the earlier accusations . . . were true or false," and that a "reliable merits determination [is] impossible." Ex. 1, Award § VIII.

87. The CBA designates arbitration as the forum in which the Union may challenge a discharge and test ONEOK's evidence. Ex. 2, CBA art. X; art. XI, §§ 2–4. At the hearing, the Union received the very protections the Arbitrator found missing: notice of the charges, access to the investigative report, and the opportunity to cross-examine ONEOK's witnesses on every

issue, and Mr. Wooley testified in his own defense. A claimed shortcoming in the pre-discharge investigation therefore could not excuse the Arbitrator from deciding the sole question the parties submitted.

88. Because the Arbitrator did not make a mutual, final, and definite award on the subject matter submitted, the Award must be vacated under 29 U.S.C. § 185 and 9 U.S.C. § 10(a)(4).

## COUNT III

### Vacatur
### The Award Does Not Draw Its Essence from the CBA and Contradicts Its Express Terms
### (29 U.S.C. § 185; 9 U.S.C. § 10(a)(4))

89. ONEOK incorporates paragraphs 1 through 88.

90. An arbitration award is enforceable only if it "draws its essence from the collective bargaining agreement and is not contrary to the express language of that agreement." *United Food & Com. Workers, Loc. Union No. 7R v. Safeway Stores, Inc.*, 889 F.2d 940, 947 (10th Cir. 1989); *see United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). An award that lacks factual support, or that is so unconnected with the wording and purpose of the agreement as to manifest an infidelity to the arbitrator's obligation, likewise does not draw its essence from the agreement. *See Mistletoe Express Serv. v. Motor Expressmen's Union*, 566 F.2d 692, 694 (10th Cir. 1977).

91. The Award contradicts the express terms of the CBA, including: (a) Article XI, Section 1, which provides that the disciplinary options "are not sequential," by requiring a progressive disciplinary process; (b) Exhibit C, which prescribes a paid suspension and an investigation that "determines the appropriate final action/outcome, up to and including termination," and recognizes that some conduct is "severe enough to warrant immediate termination," by requiring a pre-discharge adversarial hearing; (c) Article XI, Section 2, which

requires written notice after discipline, by converting it into a requirement of pre-discipline notice of a hearing's time, place, and nature; (d) Article XI, Section 5 and Article XXVI, which reserve to "[t]he Company" the right to discharge for just cause, by declaring that the right is held "together with the Union"; (e) Article X, Section 2, which forbids the arbitrator to "add to, modify, delete, or otherwise change any provision of this Agreement," by adding procedural requirements and ordering ONEOK to "review and validate" the jointly negotiated disciplinary process; and (f) Article X, Sections 1(d) and 4, which allocate the costs of arbitration equally, by shifting the Union's fees and the Arbitrator's fees to ONEOK.

92. The Award does not identify any CBA provision as the source of the procedural requirements it enforces. It relies instead on inapposite external authorities, including a federal-sector labor decision and an Ohio public-employment decision, and on the Arbitrator's own view of fair procedure. Although the Award recites that the procedural requirements it purports to enforce were "agreed to" and "published," it points to no CBA text for support because none exists and none were raised by the Union. And the Arbitrator's acknowledgment that his "job is enforcement of the contract" confirms that the Award cannot rest on his invented terms or his own general notions of fairness, particularly when those issues of fairness were not raised by the Union.

93. The Award's essential factual premises are also unsupported by the record, including its statements that ONEOK "acknowledge[d]" that no full and fair investigation was convened; that prior reprimands and a disciplinary suspension were "used to predicate" the discharge; that a "letter of reprimand" was "at issue"; and that ONEOK argued that severity was "of lesser import."

94. Because the Award does not draw its essence from the CBA and contradicts its

express terms, the Arbitrator exceeded his powers, and the Award must be vacated under 29 U.S.C. § 185 and 9 U.S.C. § 10(a)(4).

**COUNT IV**

**Vacatur or Modification**
**Paragraphs 5 Through 8 and the "Illegal Termination" Characterization**
**(29 U.S.C. § 185; 9 U.S.C. §§ 10(a)(4), 11(b))**

95. ONEOK incorporates paragraphs 1 through 94.

96. No party alleged retaliation, discrimination, or protected activity; no party asked the Arbitrator to review, validate, or change any disciplinary policy; no party alleged that the discharge violated any statute; and no party requested attorney or representative fees, costs, or any reallocation of the Arbitrator's fees. The grievance's generic requests that ONEOK "cease and desist from violating the Collective Bargaining Agreement" and that "the incident(s) be rectified" did not enlarge the submission. *See HollyFrontier*, 132 F.4th at 1189 n.1 ("broad, catch-all prayers for relief" do not "extend the arbitrator's authority beyond the parties' clear submission").

97. Paragraph 5 of the Award enjoins ONEOK to "refrain from retaliation or discrimination of Union Employees engaging in protected Union activity."

98. Paragraph 6 orders ONEOK to "review and validate its Progressive Discipline Policy to ensure its congruence and compliance with its CBA," which would require ONEOK to alter, or to assess the validity of, a disciplinary process jointly negotiated in Article XI and Exhibit C. Paragraphs 2 and 3 characterize the discharge as an "illegal termination." Ex. 1, Award § IX ¶¶ 2, 3, 5, 6.

99. Paragraph 7 of the Award orders ONEOK to "reimburse the Union for reasonable attorney and representative fees and other documented costs associated with this arbitration hearing," and Paragraphs 7 and 8 together direct ONEOK to pay all amounts owed to the

Arbitrator. Ex. 1, Award § IX ¶¶ 7–8. Article X, however, provides that "[t]he expense of the arbitrator shall be borne equally by the parties" and that "each party shall be responsible for additional costs relating to their witnesses or representatives at the hearing." Ex. 2, CBA art. X, §§ 1(d), 4, at 22.

100. Paragraphs 5 through 8 of the Award and the characterization of the discharge as an "illegal termination" exceed the scope of the submission and the Arbitrator's authority under Article X and, as to Paragraphs 7 and 8, contradict the CBA's express language. They must be vacated under 29 U.S.C. § 185 and 9 U.S.C. § 10(a)(4) even if the Court does not vacate the Award in its entirety. Alternatively, the Award must be modified under 9 U.S.C. § 11(b) to strike them, because the Arbitrator "awarded upon a matter not submitted to" him.

## COUNT V

### Vacatur
### Enforcement of the Award Would Violate Public Policy
### (29 U.S.C. § 185)

101. ONEOK incorporates paragraphs 1 through 100.

102. Courts will not enforce an arbitration award that would violate an explicit, well-defined, and dominant public policy, ascertained by reference to positive law. *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43 (1987); *W.R. Grace & Co. v. Loc. Union 759*, 461 U.S. 757, 766 (1983).

103. Federal pipeline-safety regulations establish an explicit, well-defined, and dominant public policy that covered tasks affecting the safe operation and integrity of hazardous-liquid pipelines be performed only by qualified individuals; that operators evaluate an individual when they have reason to believe the individual is no longer qualified; and that operators perform, document, and retain records of required inspections and tests. 49 C.F.R. §§ 195.404, 195.428,

195.501–.507.

104. Mr. Wooley acknowledged under oath that there were pig runs he did not do; that "[i]f documentation wasn't up to date, it was because I fell behind," Ex. 4, Tr. 240:17–25; and that falsifying safety-related information is an immediately terminable offense. *Id.* at 238:24–239:3. He did not dispute that operations control has no evidence that the required tank-overfill tests were performed. The Award makes no finding that he performed the safety tasks at issue. ONEOK does not ask the Court to reweigh the evidence; it asks the Court to decline to enforce relief that, on this record, would require ONEOK to return Mr. Wooley to covered tasks without the evaluation the federal regulations contemplate.

105. The Award orders ONEOK to return Mr. Wooley, without any condition, evaluation, or requalification, to the position of sole qualified operator at a jet-fuel terminal, and to remove from his personnel record all evidence of discipline related to the dispute—records that bear on whether ONEOK has reason to believe he is no longer qualified to perform covered tasks.

106. Enforcement of the Award's reinstatement and expungement provisions, Ex. 1, Award § IX ¶¶ 2 and 4, would conflict with the public policy embodied in 49 C.F.R. Part 195, and those provisions must be vacated.

**COUNT VI**

**Declaratory Judgment**
**(28 U.S.C. §§ 2201–2202)**

107. ONEOK incorporates paragraphs 1 through 106.

108. An actual, substantial, and justiciable controversy exists between ONEOK and the Union regarding whether ONEOK is obligated to comply with the Award, including its reinstatement, back-pay, expungement, policy-review, anti-retaliation, and fee and cost

provisions, and regarding the parties' respective obligations under Article X of the CBA to bear the costs of the arbitration.

109. ONEOK is entitled to a declaration that the Award is void and unenforceable; that ONEOK is not obligated to reinstate Mr. Wooley, to pay him back pay, benefits, or interest, to remove records relating to his discharge, to review or revise its disciplinary process, or to pay the Union's attorney or representative fees or costs; and that, under Article X of the CBA, the Arbitrator's fees and expenses are to be borne equally by the parties and each party bears its own representative and witness costs.

**PRAYER FOR RELIEF**

WHEREFORE, ONEOK respectfully requests that the Court enter judgment in its favor and against Defendants, and:

A. Vacate the Award issued by Arbitrator J.E. (Jim) Nash in FMCS No. 26-1121-01314 in its entirety;

B. Declare that the Award is void and unenforceable and that ONEOK is not obligated to reinstate Mr. Wooley, to pay him back pay, benefits, or interest, to remove from its records any evidence of the discipline at issue, to review or validate any disciplinary policy, or to pay the Union's attorney or representative fees or costs or more than one-half of the Arbitrator's fees and expenses;

C. Alternatively, vacate or modify the Award under 9 U.S.C. § 11(b) to strike Paragraphs 5, 6, 7, and 8 of the Award and the Award's characterization of the discharge as an "illegal termination," and declare that under Article X of the CBA the Arbitrator's fees and expenses are to be borne equally by the parties and each party bears its own representative and witness costs;

D. Alternatively, vacate Paragraphs 2 and 4 of the Award as contrary to public policy;

E. Deny any request or counterclaim by Defendants to confirm or enforce the Award;

F. Award ONEOK its costs; and

G. Grant such other and further relief as the Court deems just and proper.

Dated: November 6, 2026

Respectfully submitted,

*s/ Christopher S. Thrutchley*
Christopher S. Thrutchley, OBA No. 15859
Amelia A. Fogleman, OBA No. 016221
Katherine Himaya Lewis, OBA No. 36182
GABLEGOTWALS
110 North Elgin Avenue, Suite 200
Tulsa, Oklahoma 74120
Telephone: (918) 595-4800
Facsimile: (918) 595-4990
cthrutchley@gablelaw.com
afogleman@gablelaw.com
khimayalewis@gablelaw.com

*Attorneys for Plaintiff ONEOK, Inc.*